# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| COURTNEY LOCKHART, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Case No. _____ |
| | * | |
| TERRY RAYBON, | * | |
| | * | **CAPITAL CASE** |
| Respondent. | * | |

---

## VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY UNDER A DEATH SENTENCE

---

Petitioner Courtney Lockhart ("Lockhart") is presently incarcerated on death row at Holman Correctional Facility in Atmore, Alabama. Respondent Terry Raybon is the current Warden of Holman Correctional.

Lockhart's capital murder conviction and his death sentence were obtained in violation of his federal constitutional rights, as described herein. The state court's denials of Lockhart's claims were based on an unreasonable determination of the facts in light of the state court record and/or constituted an unreasonable application of, or were contrary to, clearly established United States Supreme Court precedent. Accordingly, Lockhart satisfies 28 U.S.C. § 2254(d) and respectfully petitions for a writ of habeas corpus vacating (1) his conviction for intentional murder during the

course of a robbery; and (2) his death sentence, which the trial judge imposed after overriding the jury's unanimous determination that Lockhart should be sentenced to life imprisonment without the possibility of parole.   In addition, Lockhart respectfully requests an evidentiary hearing to develop certain evidence that the state courts wrongfully denied him the opportunity to develop during his state post-conviction proceedings (*viz.*, evidence that he was prejudiced at the guilt phase by his trial counsel's unreasonable, non-strategic failure to retain a ballistics expert to support his principle defense at the guilt phase of his trial).   Section 2254(e) does not bar this Court from granting Lockhart this guilt-phase ineffective assistance of counsel evidence, because Lockhart was not at fault for failing to develop this evidence during his state court post-conviction proceeding.

## INTRODUCTION

1.      Lockhart is an African-American veteran of the United States Army. He served on the front lines of the Iraq War from approximately February 2004 through June 2005.   He was stationed on the perimeter of Ramadi, which was arguably the fiercest fighting zone of the entire war.   Lockhart's rifle battalion experienced an extraordinarily high number of casualties during his tour of duty. He witnessed the brutal deaths of fellow soldiers, and he suffered a traumatic brain injury from a close-range mortar blast.

2.      Lockhart was recognized by his superior officers as an outstanding soldier who exhibited bravery and professionalism in a chaotic war zone.  But the horrors that Lockhart witnessed in Iraq took an immense toll on him psychologically, and he returned from Iraq a psychologically broken man.  At Fort Carson, where Lockhart was temporarily stationed in preparation for a second tour of duty in Iraq, Lockhart started to exhibit classic symptoms of combat-related post-traumatic stress disorder ("PTSD").  At the time, however, the military was systemically under-diagnosing and under-treating PTSD.  Thus, like many other soldiers stationed at Fort Carson, Lockhart did not receive the psychological care that needed, and he began acting out of character.  He self-medicated with marijuana, went AWOL for periods of time, and was easily agitated.  One afternoon, he got into a fight with several fellow soldiers outside of the Fort Carson cafeteria.  This event led to Lockhart being court-martialed, sentenced to serve several months in a military jail at Fort Sill, and given a bad conduct discharge from the Army.

3.      While serving his sentence at Fort Sill, a prominent psychiatrist working for the Army examined Lockhart and concluded that Lockhart was suffering from combat-induced post-traumatic stress disorder ("PTSD").  The psychiatrist prescribed Lockhart medication to treat the condition and provided psychiatric care to Lockhart for several months.  After Lockhart was discharged

from the Army, however, he lost his insurance coverage, stopped taking his medication, and ceased receiving any other medical treatment.

4.     After being released from Fort Sill, Lockhart returned home to Alabama.  Now a civilian, Lockhart suffered silently from PTSD, and his life quickly spun out of control.  Lockhart became estranged from his girlfriend and their children, began living out of his car, and stopped showing up for work—all of which was grossly out of character for him.

5.     On March 4, 2008, while in the grip of PTSD, Lockhart made a decision that he will regret for the rest of his life.  He drove his car to the Auburn University campus, parked it in a parking lot outside one of the University's residential halls, and waited for someone to rob.  At approximately 8 p.m., Lauren Burk, a white 18-year-old freshman, walked through the parking lot toward her car. Lockhart carjacked her at gunpoint.  During their encounter, Lockhart fired a single bullet from his gun, a cheap "Saturday night special" that was susceptible to accidental discharge.  The shot had all of the hallmarks of an accidental discharge, rather than an intentional murder.  Though Lockhart and Ms. Burk were only a foot or two away from each other when the shot was fired, the bullet struck Ms. Burk in the left shoulder blade.  Tragically, the bullet travelled transversely through her sternum, piercing both lungs before exiting her body near her right armpit.  Ms. Burk died from loss of blood.

6.     The State of Alabama charged Lockhart with capital murder and sought the death penalty.

7.     Because Lockhart is African-American and Ms. Burk was white, the issue of race loomed over Lockhart's trial.  During jury selection, the prosecution used its peremptory strikes in a racially discriminatory manner, striking at least five of the eight qualified African-Americans in the venire without a valid non-discriminatory reason.  This violated Lockhart's rights under the Sixth and Fourteenth Amendments.  *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79 (1986).

8.     To convict Lockhart of capital murder (as opposed to non-capital murder), the prosecution had to prove beyond a reasonable doubt that Lockhart actually had intended to kill Ms. Burk; if the jury had a reasonable doubt whether the shooting was accidental, it would be required to acquit Lockhart of capital murder, even if the jury believed Lockhart had acted recklessly.

9.     Lockhart's defense at trial was that he had not intended to cause any physical harm to Ms. Burk and that he had accidentally discharged his gun while pointing it at Ms. Burk's shoulder.  His court-appointed trial counsel, however, had failed to retain an independent ballistics expert and, as a result, (i) was unable to marshal any expert evidence in support of that defense, and (ii) not prepared to effectively cross-examine the prosecution's ballistics expert.   Trial counsel's failures constituted prejudicial ineffective assistance of counsel with respect to the

capital murder charge, in violation of Lockhart's right to counsel under the Sixth and Fourteenth Amendments. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668 (1984).

10.     After a brief trial, the jury rejected Lockhart's accidental-discharge defense and found Lockhart guilty of capital murder.

11.     Despite its guilty verdict on the capital murder charge, the jury reached a unanimous determination that the mitigating circumstances outweighed the aggravating circumstances of the crime and that Lockhart should be sentenced to life in prison without the possibility of parole, rather than given the death penalty.

12.     At the time of Lockhart's trial, however, Alabama law gave trial judges limited authority to override a jury's sentencing determination.  In Lockhart's case, the prosecution urged the trial judge to override the jury's determination and to impose a sentence of death based on arguments that had not been presented to the jury.  Rather than bolster the mitigation record to blunt the prosecution's override arguments, however, Lockhart's trial counsel essentially sat on their hands during the roughly four months that elapsed between the jury's sentencing determination and the ultimate sentencing hearing at which the trial judge would rule on the prosecution's override request.  Because of trial counsel's neglect, the trial judge went into the sentencing hearing under the mistaken

-6-

impression that Lockhart had never been afflicted with or suffered from PTSD and unaware of the critical details of Lockhart's military service.  There was no reasonable strategic basis for trial counsel's neglect, and it greatly prejudiced Lockhart.

13.     The trial judge granted the prosecution's override request and sentenced Lockhart to death.  The trial judge justified his override based on (1) disputed facts regarding uncharged robberies that were never found by or even presented to the jury, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny; (2) the demands by Ms. Burk's family members that Lockhart be given the death penalty, in violation of *Booth v. Maryland*, 482 U.S. 496 (1987); (3) his mistaken belief that Lockhart had never been afflicted with or suffered from PTSD; and (4) his flawed determination that Lockhart's military service should not be afforded any meaningful mitigation weight.

14.     With respect to the PTSD issue, the trial judge's erroneous conclusion was the result of trial counsel's inexplicable failure to find and introduce evidence of Lockhart's PTSD.  Shortly after being appointed to represent Lockhart in March 2008, trial counsel was warned by the trial judge that the investigating whether Lockhart was suffering from combat-induced PTSD and retaining a PTSD expert could take significant time.  The trial judge granted trial counsel essentially unlimited funds to investigate the PTSD issue and warned trial counsel that they

should not delay doing so.  Despite the trial judge's warnings, trial counsel waited until September 2010—roughly six weeks from the start of trial—to retain a psychological expert to examine Lockhart for PTSD.  Incredibly, trial counsel did not retain a psychiatrist with expertise in assessing combat veterans for PTSD, but rather retained a psychologist who by her own admission is *not a PTSD expert*, was unaware that she was being retained to render a PTSD diagnosis, was not qualified to render a PTSD diagnose, and therefore did not render a PTSD diagnosis.  Trial counsel compounded the problem by failing to investigate Lockhart's medical records from Fort Sill, which would have revealed that a prominent psychiatrist working for the military determined that Lockhart was suffering from combat-induced PTSD and had prescribed medication for the condition.

15.    Largely stemming from their failure to competently investigate the PTSD issue, and for no reasonable strategic reason, Lockhart's trial counsel also was deficient in investigating and presenting to Judge Walker mitigation evidence relating to Lockhart's military record.  As a result of this additional ineffective assistance of counsel, Judge Walker concluded in his sentencing decision that Lockhart's military service should be given essentially no mitigating weight in the sentencing calculus.

16.     Trial counsel's failure to investigate, develop, and present to the trial judge the evidence of Lockhart's PTSD and the critical details of his military service in Iraq fell below the standard of professional competence that the Sixth Amendment requires.  This deficient performance prejudiced Lockhart at the sentencing phase of his proceeding, in violation of Lockhart's constitutional right to the effective assistance of counsel.  *See, e.g.*, *Strickland v. Washington*, 464 U.S. 668 (1984).

## PROCEDURAL HISTORY

17.     On November 18, 2010, a jury in Lee County, Alabama found Lockhart guilty of the capital murder of Lauren Burk.

18.     On November 19, 2010, the jury determined by a unanimous vote of 12-0 that Lockhart should be spared the death penalty and should instead be sentenced to life in prison.

19.     On March 2, 2011, Lee County Circuit Judge Jacob Walker overrode the jury's determination and sentenced Lockhart to death.  Lockhart timely appealed his conviction and sentence.

20.     On August 30, 2013, the Alabama Court of Criminal Appeals affirmed Lockhart's conviction and death sentence in an 85-page written decision. Judge J. Michael Joiner dissented from the panel's affirmance of Lockhart's death sentence.

127403910_1

21.     On September 26, 2014, the Alabama Supreme Court denied Lockhart's timely-filed petition for discretionary review.

22.     On April 20, 2015, the United States Supreme Court denied Lockhart's timely-filed petition for a writ of certiorari.  Justices Breyer and Sotomayor dissented from the denial of Lockhart's petition.

23.     On September 18, 2015, Lockhart timely filed in Lee County Circuit Court a petition for post-conviction review pursuant to Alabama Rule of Criminal Procedure Rule 32 (the "Rule 32 petition").  The Rule 32 petition raised multiple claims of constitutionally ineffective assistance of counsel that Lockhart could not have raised during his direct appeals.  The Rule 32 petition was assigned to Judge Walker, who had presided over Lockhart's trial.  Lockhart filed an amended Rule 32 complaint on May 2, 2016.

24.     Judge Walker wrongly (indeed, unreasonably) denied Lockhart's request to allow the independent ballistics expert retained by his Rule 32 defense team to examine the gun that killed Ms. Burk.  Judge Walker's denial of the request totally deprived Lockhart of the ability to adduce evidence of what an independent ballistics expert's examination of the gun would have found and, therefore, to prove the prejudice prong of his guilt-phase ineffective assistance of counsel claim.

127403910_1

25.     Judge Walker agreed, however, that Lockhart was entitled to a full evidentiary hearing on his sentencing-related ineffective assistance of counsel claim.  That evidentiary hearing spanned three days, beginning on December 17, 2018.

26.     At the hearing, Lockhart introduced significant documentary evidence that his trial counsel had unreasonably failed to investigate and discover—including his military medical records proving that he had combat-related PTSD and military records showing that his superior officers had specifically commended his extraordinary service in Iraq.

27.     At the hearing, Lockhart also introduced live testimony from the following witnesses:

- **Lead trial counsel Jeremy Armstrong**, who acknowledged that he procrastinated in seeking to retain a PTSD expert; retained psychologist Kimberley Ackerson six weeks before trial on the mistaken belief that she was a PTSD expert (R.434-35; 518); and decided to call Ackerson as a defense witness at the guilt phase despite failing to review the report she had prepared regarding her psychological assessment, which would have alerted Armstrong to the fact that Ackerson was not competent to assess Lockhart for combat-related PTSD

-11-

(R.329:9-16). Armstrong also admitted that he essentially delegated the development of Lockhart's mitigation case entirely to Sirena Saunders, a then-recent law school graduate (R.340; 497). Armstrong also admitted that he did not direct the trial team to do anything to bolster the mitigation record in advance of the sentencing phase of Lockhart's proceeding, despite knowing full well that the prosecution was urging the trial judge to override the jury's sentencing determination based on facts and considerations that had not been presented to the jury and that readily-available mitigation evidence could have rebutted (R.357).

- **Second-chair trial counsel L. Joel Collins**, who did not recall having any meaningful role in developing Lockhart's mitigation case (R.826);

- **Third-chair trial counsel Sirena Saunders**, a recent law-school graduate to whom Armstrong had essentially delegated the trial team's entire mitigation investigation. Saunders acknowledged that she failed to speak with anyone who served with Lockhart in Iraq, Lockhart's military lawyer, or any of Lockhart's co-workers at Warr Grading (R.541-42). Saunders

-12-

also confirmed that, during the four months between the jury's sentencing determination and the final sentencing hearing before the trial judge, Lockhart's trial team did nothing to attempt to bolster the mitigation record (R.818).

- **Kimberley Ackerson**, the psychologist that Lockhart's trial counsel retained roughly six weeks before trial, who testified that she is not a PTSD expert, was not aware that trial counsel had retained her to offer an opinion regarding PTSD, was not aware that Lockhart had been diagnosed with and treated for PTSD while at Fort Sill (R.654-56), and to her surprise was called as a defense witness at the guilt phase without any meaningful preparation (R.686).

- **Sergeant Jeffrey Anderson**, Lockhart's supervising officer in Iraq (R.89), who observed firsthand Lockhart's superb service during the war (R.96-97; 213), as well as his psychological deterioration after returning home to Fort Carson (R.149-50).

- **Captain Elizabeth Talarico**, Lockhart's military lawyer, who explained that the incident that resulted in Lockhart's court martial (R.197-200) and bad conduct discharge was relatively minor (R.201-03) and, contrary to what the prosecution argued

to the trial judge in its override request, did not in fact involve Lockhart threatening a female officer (R.200).  Talarico also authenticated military records showing that Lockhart's commanding officer in Iraq, Lieutenant Colonel Fant, had specifically commended Lockhart's performance in Iraq, calling him a "superb soldier."  (R.205-207.)

- **Jeffrey Pitts**, one of Lockhart's co-workers at the construction company that Lockhart worked for after returning hoe to Alabama(R.255-56), who observed Lockhart's extreme psychological deterioration in the weeks before the murder of Ms. Burk (R.261-63), which coincided with Lockhart working on a construction site adjacent to the military firing range at Fort Benning, Georgia (R.264).

- **Rebecca Gerome**, a law student at New York University and intern at the Equal Justice Initiative, who was able to obtain Lockhart's Fort Sill medical records (R.288-89), which showed his PTSD diagnosis and Paxil prescription (R.296), simply by asking Lockhart's mother for them (R.286-87).

- **Dr. Benjamin Hill**, a traumatic brain injury expert, who testified that testing of Lockhart reveals a probable traumatic

-14-

brain injury (R.737-38) that impairs Lockhart's ability to process complex information and motor control of the fingers on his right hand (R.745-46; 753-54).

- **Psychiatrist Dr. Stephen Xenakis**, a retired Brigadier General (R.860) and one of the world's foremost experts on combat-induced PTSD (R.858-59), who testified unequivocally that Lockhart has been suffering from combat-induced PTSD since his return from Iraq (R.988; 879-80; 921) and that Lockhart's PTSD would have impaired his thinking during the offense (R.972.).

28.    At the hearing, Lockhart also submitted the sworn affidavit of David Phillips, a journalist who interviewed Lockhart shortly after his indictment regarding his military service in Iraq, had obtained substantial evidence of the military's systemic under-diagnosis and under-treatment of combat-related PTSD in Lockhart's brigade, and would have made all of this evidence available to trial counsel to bolster the mitigation record.

29.    The State of Alabama called one witness at the Rule 32 evidentiary hearing, psychiatrist Dr. Glenn King.  Prior to Lockhart's trial, Dr. King had conducted an examination of Lockhart to determine whether Lockhart was legally insane at the time of the offense and was competent to stand trial.

127403910_1

(R.1037.)  For the Rule 32 proceeding, Dr. King examined Lockhart for PTSD, something that Dr. King had not previously done.  (R.1037-38, 1049.)  Dr. King agreed that Lockhart suffers from combat-induced PTSD and would have been suffering from that condition at the time of the offense.  (*Id.*)  Though Dr. King predictably disagreed that Lockhart's PTSD "caused" his decision to carjack Ms. Burk, Dr. King agreed that the circumstances of the offense were not consistent with Lockhart having planned to kill Ms. Burk. (R.1067-1074) and admitted that the circumstances were consistent with Lockhart having accidentally discharged the gun while in the throes of a PTSD episode (*e.g.*, R.1081).

30.     On April 3, 2020, Judge Walker issued a written decision finding that Lockhart's trial counsel had rendered constitutionally deficient performance at Lockhart's trial.  Judge Walker nevertheless denied Lockhart's ineffective assistance of counsel claims, finding that Lockhart had not proven prejudice. Lockhart timely appealed Judge Walker's decision.

31.     On April 23, 2021, the Alabama Court of Criminal Appeals affirmed Judge Walker's ruling in a lengthy written decision.  On July 9, 2021, the Alabama Court of Criminal Appeals withdrew its April 23, 2021 opinion and replaced it with a new written decision affirming Judge Walker's ruling.

32.     On November 19, 2021, the Alabama Supreme Court denied without comment Lockhart's timely-filed petition for discretionary review.

## JURISDICTION

33.     Lockhart direct appeals ended with the United States Supreme Court's April 20, 2015 denial of his petition for certiorari.  Thus, the one-year period for filing a federal habeas corpus petition began to run on April 21, 2015.

34.     On September 18, 2015, Lockhart filed his Rule 32 petition in Alabama state court, which served to toll the one-year statute of limitations for filing a federal petition for habeas corpus.  His Rule 32 proceedings ended on November 19, 2021, when the Alabama Supreme Court denied his petition for certiorari without comment.  The one-year statute of limitations thus began to run again starting on November 20, 2021.

35.     Based on the foregoing, this petition is therefore timely filed.  This Court therefore has jurisdiction over Lockhart's claims that his conviction and death sentence were obtained in violation of the United States Constitution.

## VENUE

36.     The Lee County Circuit Court, which is the court in which Lockhart's trial took place, is located in the Middle District of Alabama.  This Court therefore has proper venue over Lockhart's habeas corpus petition.  *See, e.g.*, *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 497 (1973).

-17-

## GROUNDS FOR RELIEF

37.     It is undisputed that, on March 4, 2008, Lockhart committed an armed robbery of Auburn University freshman Lauren Burk.  It is also undisputed that Lockhart killed Ms. Burk during the course of that armed robbery.

38.     The disputed question for the jury at the guilt-phase of Lockhart's trial was whether Lockhart *intentionally* killed Ms. Burk (capital felony murder), or whether Ms. Burk's death was the result of an *accidental discharge* of the gun that Lockhart used to commit the armed robbery (non-capital felony murder). Numerous constitutional violations infected the guilty phase of Lockhart's trial, specifically (i) the prosecution's use of racially discriminatory peremptory strikes, in violation of *Batson*; and (ii) trial counsel's deficient investigation and presentation of evidence in support of Lockhart's accidental-discharge defense, in violation of *Strickland*.

39.     After the jury found Lockhart guilty of capital felony murder, it unanimously determined by a vote of 12-0 that the aggravating circumstances of Lockhart's offense did not outweigh the mitigating circumstances and that, therefore, Lockhart should receive a sentence of life imprisonment without the possibility of parole.  At the ensuing sentencing phase of Lockhart's proceeding, the disputed issue was whether the trial judge should override the jury's recommendation and impose a sentence of death.  The trial judge's override

decision was the result of numerous constitutional errors, specifically (i) trial counsel's deficient investigation and presentation of evidence of Lockhart's PTSD and his military service, in violation of *Strickland*; (ii) the trial judge's consideration of the victim's family members' demands that Lockhart be sentenced to death, in violation of *Booth*; and (iii) the trial judge's consideration of disputed facts not found by the jury, in violation of *Apprendi*.

40.     This petition sets forth the claims in the chronological order in which the constitutional violations occurred.  Claims A and B, described below, go to Lockhart's capital murder conviction.  Claims C, D, and E, described below, go to Lockhart's death sentence.  Each of these constitutional claims was properly raised during Lockhart's state court proceedings, and none were disposed of on an independent and adequate state law ground.

41.     To the extent the state courts addressed the claims on the merits, the state courts' decisions were (1) an unreasonable application of or contrary to clearly established United States Supreme Court precedent, and/or (2) based on an unreasonable determination of the facts in light of the state court record.  Accordingly, insofar as the state courts addressed the claims on the merits, Lockhart satisfies 28 U.S.C. § 2254(d)'s deference requirements, and this Court is entitled to grant Lockhart habeas relief on the claims.

**A.     The Prosecution's Racially Discriminatory Peremptory Strikes**

42.    In *Batson*, the Supreme Court held that the prosecution violates a defendant's rights under the Sixth and Fourteenth Amendments by exercising its peremptory strikes in a racially discriminatory manner.  Where a defendant makes out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose, the burden then shifts to the prosecution to provide an adequate, bona fide racial neutral explanation for the peremptory strike.

43.    The issue of race loomed over Lockhart's trial.  Lockhart is African-American; Ms. Burk was white.

44.    In Lockhart's case, the jury (including the alternates) was picked from a group of 40 potential jurors that the trial judge had deemed qualified.  Eight of the 40 were African-American.  This was consistent with the overall racial makeup of Lee County, which is approximately 25% black.

45.    The prosecution used peremptory strikes to exclude five of the eight African-Americans—63% of them—from the final jury.  Even more suspiciously, the prosecution used its first, third, fifth, sixth peremptory strikes on African-Americans.  In other words, the prosecution used 66% of its first six strikes to exclude from the final jury 50% of the African-Americans remaining in the pool.

46.    After the defense raised a *Batson* challenge to the prosecution's pattern of peremptory strikes, the trial judge asked the prosecution to place on the

record its purportedly race-neutral reasons for each of the five strikes at issue. The prosecution's proffered race-neutral justifications for the strikes, viewed in light of the totality of the circumstances, were pre-textual.

47.     Although the prosecution's proffered race-neutral justifications for the strikes were pre-textual, the trial judge concluded that they were adequate and denied the defense's *Batson* challenge.

48.     On appeal, the Alabama Court of Criminal Appeals held that the prosecution's asserted justifications for its strikes of the African-American prospective jurors were race-neutral and not pre-textual, notwithstanding that the prosecution's asserted justifications clearly showed that, when an African-American and white prospective juror were similarly situated, the prosecution systematically struck the African-American and not the white prospective juror. The appeals court's ruling (i) was based on an unreasonable determination of the facts in light of the trial record, and (ii) constituted an unreasonable application of, or was contrary to, *Batson*. Lockhart therefore satisfies § 2254(d) and is entitled to habeas relief on the claim.

**B.     Ineffective Assistance of Counsel at the Guilt Phase**

49.     The evidence that was known to trial counsel was consistent with Lockhart's statement to law enforcement that he had accidentally shot Ms. Burk. Lockhart had carjacked Ms. Burk in the parking lot located essentially in the center

of the Auburn University campus. Lockhart drove away from the campus with Ms. Burk in the passenger seat of the car. Lockhart drove the car, with Ms. Burk in the passenger seat, for nearly an hour. At the time that Ms. Burk was shot, Lockhart was driving the car in the direction back toward the Auburn University campus on a heavily trafficked stretch of highway, consistent with his post-arrest statement to law enforcement that he had recognized the irrationality of the carjacking, did not intend to harm Ms. Burk, and was returning Ms. Burk to campus. Although the shooting occurred at very close range, Ms. Burk was shot in the left shoulder blade—not a location that someone attempting to kill would be aiming for. In addition, the gun that Lockhart used in the carjacking was a shoddily manufactured "Saturday night special," which can have inconsistent trigger pull weights and be unusually prone to accidental discharge. *See, e.g.*, Brian Heard, <u>Forensic Ballistics in Court: Interpretation and Presentation of Firearms Evidence</u> 200 (2014).

50.     Based on the evidence known to them, trial counsel correctly determined that Lockhart's core defense at the guilt phase of the trial was that he had not intended to kill Ms. Burk and that the shooting was the result of an accidental discharge of the gun.

51.     For no reasonable strategic reason, however, trial counsel failed to investigate and present expert evidence to substantiate this defense, notwithstanding that the trial court had indicated early on in the case that it would

-22-

grant any reasonable request for expert witness fees.  In particular, trial counsel

failed to retain an independent ballistics expert who would have (i) helped trial

counsel prepare an effective cross examination of the prosecution's ballistics

expert, and (ii) conducted his own forensic examination of the gun in order to

obtain forensic evidence supporting Lockhart's accidental discharge claim.

52.     At trial, the prosecution presented the testimony of its forensics expert

Katherine Richert in an attempt to demonstrate that an accidental discharge of the

gun was unlikely.  Richert testified that (a) she conducted a trigger pull weight

analysis of the gun using "a spring scale similar to one that you would weigh a fish

with," and (b) based on trigger pull weight tests performed on three of the gun's

six chambers, the gun had a trigger pull average of 5 pounds in "single action"

mode.   Richert did not keep a record of the trigger pull weight for each of the

three chambers that she tested, however.  Nor did she know what the trigger pull

weights might have been for the other three chambers.

53.     A reasonably competent cross examination of Richert would have

demonstrated that her trigger pull weight testing of the gun was incomplete,

imprecise, and unreliable and an inadequate basis to conclude that an accidental

discharge of the gun was unlikely.  But because Lockhart's trial counsel had not

retained a ballistics expert to assist the defense, the cross examination of the

Richert essentially was limited to eliciting that the trigger pull weights of the three

-23-

chambers that she tested could have ranged from 4.5 to 5.5 pounds. Lockhart's trial counsel did not even explore on cross examination whether that is a relatively light trigger pull weight that can make a gun susceptible to accidental discharge during times of stress (which it is). During his time in the military, Lockhart was trained on weapons with significantly higher trigger pull weights than 5 pounds, which trial counsel did not elicit from any witness during trial.

54.     Even worse, trial counsel's failure to retain an independent ballistics expert meant that the defense never conducted *any testing* of the gun. More complete, reliable testing of the gun than Richert had performed would have demonstrated that the gun was far more susceptible to accidental discharge than the prosecution was arguing. In addition to testing the trigger pull weights of the three chambers that Richert did not test (which might have had significantly lower trigger pull weights than the ones that she did test) and testing trigger pull weights using something more reliable than the spring gauge that Richert used, a competent forensic analysis of the gun would have included an assessment of the gun's "lock mechanism." Such an assessment would have shown that the lock mechanism was faulty. Every gunlock mechanism is comprised of a spring-loaded rotating or sliding hammer that has a slight notch carved into it known as a "bent." Where accidental discharges are caused by faulty lock mechanisms, most often they are due to defects in the bent. Trial counsel did not adequately investigate or hire their

-24-

own expert to examine the gun for bent defects.  Counsel also did not adequately

investigate or hire their own expert to examine possible defects to the sear, which

is the part of the trigger that holds the hammer back until the correct amount of

pressure is applied.  Likewise, because the weapon was of such low quality, there

was the possibility that it had a faulty half-cock safety mechanism that could have

led the gun to fire inadvertently.  Trial counsel did not adequately investigate this

possibility or employ their own expert to examine the gun for defects in the

half-cock safety mechanism.

55.     An independent ballistics expert also would have concluded that the

presence of dirt inside the gun—which Richert testified to during her examination,

but the significance of which trial counsel did not understand and did not

adequately explore on cross examination—increased the risk of accidental

discharge.  *See, e.g.*, John C. Klotter, <u>Criminal Evidence</u> 544 (2000) (discussing

the impact of dirt in a firearm).

56.     Trial counsel understood that retaining an independent ballistics and

toolmark expert both to impeach the testimony of the State's expert and to present

evidence to support the defense theory of the case was critical.  Trial counsel

further understood that if they asked the court for funds for such expert, that

request almost certainly would have been approved.  Trial counsel had no

reasonable strategic reason in not retaining an independent ballistics expert to

review Richert's analysis, help with the preparation of Richert's cross-examination, and conduct an independent forensic assessment of the gun. Indeed, at the Rule 32 evidentiary hearing, lead trial counsel Jeremy Armstrong acknowledged that failing to retain a ballistics expert was simply an inexcusable oversight. (R.479-480.)

57. Trial counsel's deficient performance prejudiced Lockhart, because the evidence that an independent ballistics expert would have enabled trial counsel to elicit, both on cross-examination of Richert and in the defense's case-in-chief, would have substantially bolstered Lockhart's accidental discharge defense. The defense already was consistent with the circumstances of the shooting, including the location of the entrance wound (the left shoulder blade) and the road that Lockhart and Ms. Burk were traveling when the shot occurred (a heavily trafficked highway running back toward the Auburn University campus). Forensic evidence showing that the gun was far more prone to accidental discharge than the prosecution's expert was willing to let on would have strengthened the defense substantially.

58. Had the jury concluded that the prosecution had not proven an intentional killing beyond a reasonable doubt, it would have been required to acquit Lockhart of the capital murder charge. Although the jury still would have

convicted Lockhart of non-capital felony murder, that is not a death eligible offense.

59.    During the Rule 32 proceedings, Lockhart specifically requested the opportunity to have the gun examined by a recognized ballistics expert, Francis "Jay" Jarvis, that his Rule 32 legal team had retained.  The gun has been in the possession of the Lee County Court since Lockhart's trial and is formally part of the trial record.  Lockhart supported his request with a sworn affidavit from Mr. Jarvis, where Mr. Jarvis set forth in detail the various reasons why he had a good faith expectation that an examination of the gun could unveil accidental-discharge evidence that Lockhart's trial counsel had failed to discover and present at Lockhart's trial.

60.    Judge Walker, however, unreasonably denied Lockhart's request to allow Mr. Jarvis to examine the gun.  Thus, even though Lockhart's lead trial counsel Jeremy Armstrong admitted at the Rule 32 hearing that his failure to retain an independent ballistics expert was inexcusable and not based on any strategic considerations (*i.e.*, constituted deficient performance), Lockhart was deprived of the ability to adduce evidence proving the prejudice prong of his guilt-phase ineffective assistance of counsel claim.

61.    On appeal, over the dissent of Judge Kellum, the Alabama Court of Criminal Appeals found no error in Judge Walker's denial of Lockhart's request to

allow Mr. Jarvis to examine the gun and, consequently, concluded that Lockhart had failed to demonstrate prejudice under *Strickland*.

62.     The state court's denial of Lockhart's guilt-phase ineffective assistance claim (i) was premised on an unreasonable refusal to allow Lockhart's the ability to adduce evidence in support of the claim, (ii) was based on an unreasonable determination of the facts in light of the state court record, and (iii) constituted an unreasonable application, or was contrary to, *Strickland* and its progeny.

63.     With respect to this claim, Lockhart was not at fault for failing to develop the ballistics evidence in support of the prejudice prong.  Instead, the state courts unreasonably deprived him of the opportunity to have Mr. Jarvis examine the gun.  Section 2254(e) is therefore no bar to a federal evidentiary hearing with respect to the prejudice prong of this claim, and Lockhart respectfully requests, and is entitled to, such a federal evidentiary hearing.  If this Court allows Mr. Jarvis to examine the gun, Lockhart will present at the federal evidentiary hearing evidence of Mr. Jarvis's ballistics findings.  Such evidence will demonstrate that the state court's denial of the claim either (i) was not on the merits and therefore not entitled to deference, (ii) was based on an unreasonable determination of the facts, or (iii) constituted an unreasonable application of, or was contrary to, *Strickland* and its

progeny.  Lockhart therefore will satisfy § 2254(d) with respect to this claim and will be entitled to relief on the claim.

### C.     Ineffective Assistance of Counsel at the Sentencing Phase

64.     Soon after being appointed to represent Lockhart, trial counsel recognized that Lockhart's PTSD and military service would both be relevant issues.  Early in their representation of Lockhart, trial counsel correctly determined that, if he were convicted of capital murder, Lockhart's mitigation strategy should be to (i) demonstrate that he was suffering from combat-related PTSD from the time he returned home from Iraq through the crime against Ms. Burk, and (ii) emphasize his record of military service.

65.     Trial counsel's professional obligations, however, did not end with *choosing* a reasonable trial strategy.  Trial counsel was also obligated to competently *follow through* on that strategy, including investigating, developing, and presenting the readily available evidence of Lockhart's PTSD and his brave and commendable service to the defense of our country in the Iraq War.  Trial counsel utterly failed in this regard.

### Trial Counsel's Unreasonable Failure to Investigate, Develop, and Present the PTSD Evidence

66.     In March 2009, roughly eighteen months prior to trial, trial counsel told the trial judge that they needed at least $10,000 in funding for a "psychologist," $15,000 for a "mitigation expert," and $15,000 for "a post-

-29-

traumatic stress disorder expert."  When the trial judge asked whether a PTSD
expert would be "different from the psychologist or psychiatrist" for whom trial
counsel requested $10,000 in funding, trial counsel answered "yes."  The trial
judge ultimately approved all of trial counsel's funding requests.

67.     Despite having substantial court funding, trial counsel did not retain
any expert of any kind until nearly eighteen months later, in mid-September 2010,
only eight weeks before the start of trial.  The one and only expert they retained
was psychologist Kimberley Ackerson.

68.     There was no reasonable strategic justification for the nearly
seventeen-month delay between the trial judge's awarding of expert funding and
trial counsel's retention of Ackerson.  Trial counsel's inexcusable delay, however,
was just the tip of the iceberg of problems with their retention of Ackerson.

69.     Trial counsel retained Ackerson to serve as their "post-traumatic
stress disorder expert."  Trial counsel never actually informed Ackerson, however,
that they "wanted [her] to be retained as a PTSD expert," and she therefore "did
not know" that trial counsel expected her to perform a full blown PTSD assessment
of Lockhart.   Instead, Ackerson thought trial counsel was retaining her merely to
provide "mitigation services."  Ackerson does not "consider [herself] a . . . PTSD
expert," and, had she known trial counsel was seeking to retain her for that
purpose, she would have told them "they would need to seek out somebody else."

70.     Unreasonably blind to Ackerson's shortcomings, trial counsel called Ackerson to the stand during the guilt phase of Lockhart's trial.  Incredibly, trial counsel did nothing to prepare Ackerson for her testimony.  Indeed, Lockhart's lead trial counsel Jeremy Armstrong admitted during the Rule 32 evidentiary hearing that he made the decision to call Ackerson to the stand despite the fact that he did not even read the report she wrote regarding her evaluation of Lockhart. Had Armstrong read Ackerson's report, he would have immediately seen that her failure to find that Lockhart was suffering from combat-related PTSD was the result of Ackerson not having conducted any competent PTSD evaluation of Lockhart and Ackerson not even having access to sufficient facts to make such an evaluation.

71.     Not surprisingly, Ackerson's testimony was a disaster for Lockhart. Specifically, Ackerson acknowledged during the prosecutor's cross examination that she had not found Lockhart to be suffering from PTSD.

72.     Although trial counsel still had time to retain an actual PTSD expert prior to the sentencing phase of Lockhart's trial, which did not occur until approximately four months later, trial counsel inexplicably chose not to do so. The prosecution exploited Ackerson's ill-informed testimony for the remainder of the proceeding, including at the sentencing phase.

73.     Compounding their deficient performance with respect to their failure to retain an actual PTSD expert, trial counsel also failed to investigate (and therefore failed to find) the evidence of Lockhart's PTSD diagnosis at Fort Sill.  At a court hearing in March 2009, trial counsel told the trial judge that they understood a psychiatrist at Fort Sill had found Lockhart to be suffering from PTSD.  Trial counsel stated that they would need to incur expenses to travel to Fort Sill to speak with this psychiatrist and that this psychiatrist might end up being the defense's PTSD expert.  Trial counsel, however, then did *zero follow up* on this. They did not travel to Fort Sill, speak to the psychiatrist at Fort Sill, or even obtain Lockhart's Fort Sill medical records (which he could have obtained from Fort Sill or, even more simply, by asking Lockhart's mother for copies of all the military paperwork in her possession).  There was no reasonable strategic reason for this failure, which resulted in the evidence neither being found nor being presented.

74.     Because of trial counsel's deficient failure to retain a PTSD expert and to search for and find the evidence of Lockhart's prior PTSD diagnosis, the trial judge was left with the mistaken impression that Lockhart did not have PTSD at the time of the offense and in fact had never had PTSD.  This prejudiced Lockhart at the sentencing phase, because the trial judge's mistaken impression that Lockhart did not have, and never had, PTSD infected the core of his analysis of the mitigating circumstances.

-32-

75.    First, the trial judge determined that Lockhart's "criminal conduct while in the Army" after returning from his tour of duty in Iraq—namely, his use of marijuana, going absent without leave for a short period, and his supposed assault of a non-commissioned officer during a shouting match—was a reason to place "very little [mitigation] weight" on Lockhart's lack of significant criminal history, as well as his military service.  Had trial counsel competently investigated and presented evidence of Lockhart's PTSD, the trial judge would have understood that this aberrant conduct after Lockhart returned from Iraq was symptomatic of his PTSD, and not a reflection of poor character.  This would have ensured that the trial judge placed appropriate mitigation weight on Lockhart's military service, including especially his combat service in Iraq during the worst period of the war.

76.    Second, the trial judge gave "little weight" to Lockhart's psychological state at the time of the offense because "Ackerson testified that Lockhart did not have symptoms severe enough for a diagnosis of [PTSD]," "[n]either Lockhart nor his family sought mental health treatment on his behalf," and Lockhart's mental state did not "seem to interfere" with his employment as a construction worker at the time of the offense.  But a qualified PTSD expert would have resolved any doubt about whether Lockhart was suffering from PTSD (he was), and a competent investigation into the PTSD evidence would have shown that Lockhart previously received treatment for the condition at Fort Sill, that he

-33-

stopped receiving treatment only after he lost access to the military's medical facilities, and that PTSD had dramatically interfered with his employment in the weeks leading up to the offense

77.     A qualified PTSD expert would have testified that Lockhart was suffering from combat-related PTSD and combat-related major depressive disorder at the time of the offense.  A qualified PTSD expert also would have explained that, at the time of the offense, Lockhart's PTSD and depression was manifesting itself in disturbed sleep patterns, anxiety, and confusion, impairing his "thinking and the ability to think clearly, and to have control over your emotions and be able to make good decisions."  While not a legal excuse for Lockhart's criminal conduct, this evidence would have helped place Lockhart's actions in the proper context with respect to the mitigating and aggravating circumstances.

78.     On appeal, the Alabama Court of Criminal Appeals held that trial counsel's incompetent investigation and development of the PTSD evidence, while deficient performance, was not prejudicial under *Strickland*.  The Alabama Court of Criminal Appeals, however, placed on Lockhart a burden of persuasion that is substantially higher than what *Strickland* dictates.  Among other things, the Alabama Court of Criminal Appeals held that Lockhart had not proven prejudice because he had not proven that his PTSD *caused* him to carjack and shoot Ms. Burk, notwithstanding that the United States Supreme Court has specifically held

-34-

that a mental defect is a significant mitigating factor in a capital case even where there is no direct causal connection between the mental defect and the crime.

79.     The Alabama Court of Criminal Appeals's finding of no prejudice (i) was based on an unreasonable determination of the facts in light of the state court record, and (ii) constituted an unreasonable application of, or was contrary to, *Strickland* and its progeny.

### Trial Counsel's Unreasonable Failure to Investigate, Develop, and Present the Critical Details of Lockhart's Military Service in Iraq, and Its Unreasonable Decision Not to Present Any Such Evidence at the Sentencing Phase of Lockhart's Proceeding in Order to Bolster the Mitigation Record and Blunt the Prosecution's Override Arguments

80.     Trial counsel's failure to competently investigate the PTSD issue also had the collateral effect of causing trial counsel to make the unreasonable decision not to investigate or present at the sentencing phase of Lockhart's proceeding any of the powerful, detailed evidence regarding Lockhart's military service in Iraq.

81.     Early on, trial counsel determined that one of their mitigation strategies should be to emphasize Lockhart's military service in Iraq.  This was a smart strategy to pursue.  Lockhart's tour of duty in Iraq was not an ordinary one. Lockhart served on the outskirts of Ramadi—arguably the most dangerous region in Iraq—during the hottest part of the war.  Lockhart's brigade was constantly under fire, and it experienced an unusually high number of casualties.  Lockhart witnessed the deaths of his friends in battle, and he was almost killed when a

mortar shell exploded near him in his barracks.  Through all of this, Lockhart

served in Iraq with honor and bravery, earning the trust and commendation of his

commanding officers.

82.    Yet, trial counsel once again failed to competently execute on his

strategy.  Trial counsel's deficient performance began with lead trial counsel

Jeremy Armstrong's decision to delegate the investigation and development of

mitigation evidence almost entirely to third-chair Sirena Saunders, who was a

recent law school graduate with no capital trial experience.  Entrusted with the

mitigation investigation, Saunders then failed even to interview—or have a

mitigation expert interview—a single member of Lockhart's Iraq War brigade.

This was despite the fact that members of Lockhart's brigade were willing to

testify and, in fact, had reached out to Lockhart's trial team to offer their

assistance.

83.    Instead, trial counsel chose to elicit evidence regarding Lockhart's

military service solely from his girlfriend Nicole Threatt and his mother, both of

whom are civilians who could not offer any direct or detailed evidence about

Lockhart's service in Iraq.  As a result, when it sentenced Lockhart to death, the

Court had not heard—either firsthand, or secondhand—from a single person who

served with or commanded Lockhart in Iraq.  These were the witnesses—not

Lockhart's girlfriend or mother—who would have been able to paint for the trial

-36-

judge a vivid portrait of the horrors that Lockhart lived through in Iraq, the bravery and professionalism he showed on the battlefield, the epidemic of PTSD in his brigade, and the insufficient psychological treatment that the brigade received when it returned home.

84.     Trial counsel's failure to speak with any of Lockhart's brigade members cannot be deemed a reasonable strategic one.  Trial counsel understood that Lockhart himself was reticent to speak about his Iraq experience, particularly with individuals he did not know and did not trust, and therefore was a deeply imperfect source of information about his tour of duty.  Trial counsel also knew that members of Lockhart's brigade—including his direct supervisor in Korea and Iraq, Sergeant Jeffrey Anderson, who had proactively called trial counsel well prior to Lockhart's trial to offer his assistance—were willing and available to assist with Lockhart's defense, including as trial witnesses.  Moreover, had trial counsel reviewed or investigated Lockhart's military file, they would have learned that Lockhart's Battalion Commander in Iraq, Lieutenant Colonel John Fant, previously had stated under oath that Lockhart was a "superb soldier" in Iraq and may have been willing to provide live mitigation testimony in support of Lockhart.

85.     At the Rule 32 evidentiary hearing, trial counsel asserted a concern that introducing evidence of Lockhart's military service would have "opened the door" to evidence of Lockhart's court martial and bad conduct discharge.  But trial

-37-

counsel already had introduced evidence of Lockhart's military service; it was simply not detailed or powerful, because it came from the wrong witnesses (Lockhart's girlfriend and mother).  In addition, the trial judge already was aware of the circumstances giving rise to the court martial, and trial counsel knew that the prosecution would emphasize the court martial in arguing for judicial override of the jury's determination that Lockhart should be spared the death penalty. Moreover, under Alabama law, the prosecution was not restricted from presenting to the trial judge at sentencing whatever evidence it wished.  Thus, refraining from putting on detailed evidence of Lockhart's military service did not "keep the door closed" to evidence of which the trial judge otherwise was unaware or that the prosecution was not absolutely entitled to present to the trial judge at the sentencing phase under Alabama law.  Furthermore, had trial counsel simply investigated the circumstances of the bad conduct discharge, including speaking with Lockhart's court-appointed Judge Advocate General defense lawyer from the court martial proceeding, trial counsel would have learned that the conduct that gave rise to the bad conduct discharge was not nearly as serious as the prosecution was arguing.  Finally, had trial counsel competently investigated the PTSD issue, they would have understood that the circumstances that gave rise to the court martial and bad conduct discharge were consistent with Lockhart suffering from untreated PTSD at Fort Carson.

-38-

86.     Trial counsel's failure to investigate and present detailed evidence of Lockhart's military service in Iraq was not a reasonable strategic one, and it prejudiced Lockhart because it caused the prosecution's arguments about Lockhart's court martial and bad conduct discharge for his infractions at Fort Carson to go essentially unrebutted, caused the trial judge to be left with a woefully incomplete picture of Lockhart's service in Iraq, and ultimately led the trial judge to afford little mitigation weight to Lockhart's military service.  Had the trial judge been made aware of the full scope of Lockhart's military service, including being made aware of the context surrounding the court martial and bad conduct discharge, he would have given Lockhart's military service the mitigation weight it deserved, creating at least a reasonable probability that the trial judge would have honored the jury's unanimous determination that Lockhart should be spared the death penalty.

87.     The Alabama Court of Criminal Appeals found that trial counsel's failure to investigate and present details of Lockhart's military service via members of his military brigade was a reasonable strategic decision or, alternatively, an excusable failure.  Having concluded that Lockhart failed to satisfy the deficient performance prong of *Strickland* with respect to this evidence, the Alabama Court of Appeals eschewed any prejudice analysis, which means

there is no prejudice analysis to which the federal courts must defer under 28 U.S.C. § 2254(d).

88.     The Alabama Court of Criminal Appeals's finding of no deficient performance with respect to the military service evidence (i) was based on an unreasonable determination of the facts in light of the state court record, and (ii) constituted an unreasonable application of, or was contrary to, *Strickland* and its progeny.

89.     The fact that the Alabama Court of Criminal Appeals expressly declined to consider the military service evidence as part of its *Strickland* prejudice-prong calculus meant that its *Strickland* prejudice-prong determination on the other components of Lockhart's sentencing-related ineffective assistance of counsel was an unreasonable application of *Strickland*, because it failed to cumulatively consider all of the mitigation evidence that trial counsel deficiently failed to investigate, discover, and present.

### Trial Counsel's Failure to Investigate, Develop, and Present Evidence of Lockhart's Traumatic Brain Injury

90.     Trial counsel also engaged in deficient performance insofar as they did not retain an expert to examine Lockhart for a traumatic brain injury.  Early on in their representation of Lockhart, trial counsel learned that Lockhart had been exposed to a close range mortar blast in Iraq.  It was already well known that close range mortar blasts caused traumatic brain injuries, even in the absence of

-40-

superficial physical injuries.  Several government studies regarding traumatic brain injuries in Iraq War veterans had been released, and the Department of Defense had acknowledged that traumatic brain injury was the "signature injury" of the Iraq War.

91.     Despite all of the warnings signs that Lockhart had suffered a traumatic brain injury from his mortar blast exposure, trial counsel unreasonably failed to retain an expert to assess Lockhart for a traumatic brain injury.  Had Lockhart's trial counsel retained such an expert, they would have learned that Lockhart exhibited cognitive and motor control impairment consistent with a traumatic brain injury.  Trial counsel's deficient performance prejudiced Lockhart, because evidence of traumatic brain injury would have been a powerful mitigating circumstance at the sentencing phase of Lockhart's proceeding.

92.     With respect to the traumatic brain injury issue, the Alabama Court of Criminal Appeals found no deficient performance because, in its view, Dr. Hill was "inconclusive" as to whether Lockhart had a traumatic brain injury at the time of the offense against Ms. Burk.  This was an unreasonable determination of the facts in light of the state court record.  Dr. Hill had reached a definitive medical conclusion that Lockhart has a traumatic brain injury and ruled out that the injury would have originated or worsened after the offense against Ms. Burk.  The State

of Alabama did not introduce any contrary evidence during the Rule 32 proceedings or impeach Dr. Hill's medical diagnosis in any relevant way.

93.     The Alabama Court of Criminal Appeals also found no prejudice with respect to this issue because Dr. Hill would not have been available to testify at Lockhart's trial proceeding and Lockhart had not identified "by name" any other traumatic brain injury expert who would have been available to testify.  This was an unreasonable determination of the facts in light of the state court record and, in addition, constituted an unreasonable application of *Strickland* and its progeny. Even if Dr. Hill would not have been available to testify at Lockhart's trial proceeding because he had just completed his medical fellowship at the time of Lockhart's trial, Dr. Hill testified during the Rule 32 proceeding that the traumatic brain injury tests he performed on Lockhart were the standard tests that had been utilized for years, were available and well known at the time of Lockhart's trial, and that any traumatic brain injury expert would have run on Lockhart at any point between 2008 and 2010.  Dr. Hill's testimony clearly established that finding a traumatic brain injury expert available to testify at the time of Lockhart's trial would have been a relatively simple endeavor.  Requiring Lockhart to go further and to identify *by name* the expert that trial counsel could have called at Lockhart's trial was an unreasonable application of *Strickland* and its progeny.

-42-

**D.     The Trial Judge's Violation of *Booth v. Maryland***

94.     In *Booth v. Maryland*, 482 U.S. 496, 501-502 (1987), the United States Supreme Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence" that does not "relate directly to the circumstances of the crime."  In *Payne v. Tennessee*, 501 U.S. 808, 817 (1991), the Supreme Court overruled *Booth* in part, holding that the sentencing decision-maker may consider "evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family."  In *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016), the Supreme Court explained that *Payne* did not disturb *Booth*'s holding that the sentencing decision-maker may not consider the "victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence . . . ."  The Supreme Court in *Bosse* confirmed that *Booth* prohibits the consideration of "opinions from a victim's family members about the crime, the defendant, and the appropriate sentence . . . ."  *Id.*

95.     The trial judge's override decision did precisely what *Booth* prohibits. At the sentencing hearing, over Lockhart's objections, the trial judge allowed several of Ms. Burk's family members to express their opinion regarding whether Lockhart should be spared the death penalty or sentenced to death.  The trial judge then expressly considered these opinions in deciding to override the jury's

-43-

sentencing determination.  Specifically, in his written override decision, under the caption "The recommendation of the victim's family," the trial judge stated: "At the sentencing hearing, several members of Burk's family stated that they do not recommend leniency and in fact asked that Lockhart receive the death penalty. This factor . . . weighs in favor of judicial override . . . ."

96.     On appeal, the Alabama Court of Appeals held that it was not improper for the trial judge to have considered the sentencing recommendations of Ms. Burk's family members.  The Alabama Court of Appeals treated *Booth*'s prohibition as extending only to the presentation of evidence *to a jury*.  This was an unreasonable application of, and contrary to, *Booth*.

97.     In *Booth*, unlike in Alabama at the time of Lockhart's trial, the jury was the final decision-maker with regards to the defendant's sentence.  The Supreme Court's holding in *Booth* was clear and unambiguous: opinions of the victim's family regarding the appropriate sentence "is irrelevant to a capital sentencing decision," and consideration of those opinions "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner."  482 U.S. at 503-505.  *Booth* held that the introduction of such evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment," *id.* at 510, and that is precisely what occurred in Lockhart's case.  Indeed, unlike in *Booth*, where the jury may or may not have considered the impermissible evidence,

in Lockhart's case the trial judge made clear that he considered as part of his override calculus the opinions of Ms. Burk's family members regarding whether Lockhart should be given the death penalty.

98.     Because the Alabama Court of Criminal Appeals's decision constituted an unreasonable application of, or was contrary to, *Booth*, Lockhart satisfies § 2254(d).

99.     To the extent the Alabama Court of Criminal Appeals found that Lockhart's trial counsel had failed to object to the trial judge's acceptance and consideration of Ms. Burk's family members' statements that they wished to see Lockhart put to death, this finding constituted an unreasonable determination of the facts in light of the state court record.  Trial counsel plainly lodged a contemporaneous objection to the trial court's consideration of Ms. Burk's family members' statements about their desire to see Lockhart put to death.  Despite this objection, the trial court expressly considered the family members' desires as one of the bases for overriding the jury's determination that Lockhart should be sentenced to life imprisonment.

### E.     The Trial Judge's Violation of *Apprendi* and Its Progeny

100.    At the time of Lockhart's trial, Alabama law allowed the trial judge the ability to override the jury's determination that the defendant, though convicted of capital murder, should be spared the death penalty and sentenced to life in

127403910_1

prison without the possibility of parole.  In other words, Alabama law allowed the trial judge to impose a sentence of death even though the jury had determined that the defendant should be spared the death penalty.

101.    The trial judge's ability to override the jury's sentencing determination was constrained, however.  The trial judge was required to give "great weight" to a jury's unanimous determination that the defendant should be spared the death penalty.  *See, e.g.*, *Ex parte Tomlin*, 909 So. 2d 283, 286-287 (Ala. 2003).  And a trial judge's override decision would be reversed on appeal as unlawful—*i.e.*, reversed as having exceeded the trial judge's sentencing authority—unless there was relevant "information known only to the trial court and not to the jury" that "undermine[d]" the jury's sentencing determination.  *Id.* at 285.

102.    In this regard, Alabama's judicial override structure ran headlong into the United States Supreme Court's holdings in *Apprendi* and its progeny.  In *Apprendi*, the Supreme Court held that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  530 U.S. at 476 (internal quotations omitted).

103.    In *Blakely v. Washington*, 542 U.S. 296, 304 (2004), the Supreme Court clarified that the "maximum sentence" for *Apprendi* purposes is "not the

-46-

maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.  When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his [constitutional] authority."

104.   In Lockhart's case, the jury had found a single aggravating circumstance—that Lockhart had killed Ms. Burk during the commission of a robbery and kidnapping.  The trial judge did not find any additional aggravating circumstances.

105.   The trial judge recognized that the jury's unanimous determination that Lockhart should be spared the death penalty, on its own, ordinarily would be entitled to such great weight as a mitigating circumstance that the death penalty could not lawfully be imposed on Lockhart.  The trial judge, however, proceeded to find additional facts—facts neither found by nor even presented to the jury—in order to dilute the mitigating weight afforded to the jury's sentencing determination.  The trial judge outlined these factual findings, which were largely based on hearsay statements that Lockhart was not even afforded an opportunity to confront via cross examination, in a portion of his written override decision captioned "Additional facts unknown to the jury."

106.   First, the trial judge found that in the few days before and after Ms. Burk's murder, Lockhart had committed several armed robberies involving women victims.  Although Lockhart had confessed during his police interrogation to several of these incidents, the trial judge found disputed facts regarding Lockhart's conduct during these robberies, including whether Lockhart had pointed his gun at the victims and threatened to shoot them and, in one of the incidents, whether Lockhart had struck the victim in the head with his fist.

107.   Second, the trial judge found that while in the Army, shortly after completing his tour of duty in Iraq, Lockhart had assaulted a non-commissioned officer with a concealed weapon—something that Lockhart disputed and which was untrue.

108.   Without these judicial findings of fact, the trial judge not only would not have imposed the death penalty, but would have lacked the lawful authority to impose the death penalty on Lockhart.  That is, without these judicial findings of fact, the trial judge could not have found that the lone aggravating circumstance found by the jury outweighed the mitigating circumstance of the jury's unanimous determination that Lockhart should be spared the death penalty, and the trial judge's override of the jury's sentencing determination therefore would have been reversed on appeal as having exceeded his lawful sentencing authority.  This is a paradigmatic violation of *Apprendi* and its progeny.

-48-

109.   In addition, the jury already had found that the aggravating circumstances of Lockhart's offense did not outweigh the mitigating circumstances, which meant that Lockhart was not eligible to receive the death penalty.  The trial judge's contrary finding that the aggravating circumstances outweighed the mitigating circumstances was itself a factual finding for *Apprendi* purposes, which meant that his judicial override of the jury's determination was an *Apprendi* violation *per se*.

110.   Lockhart objected, on *Apprendi* grounds, to the trial judge's override. The Alabama Court of Criminal Appeals, however, held that the United States Supreme Court's *Apprendi* line of cases categorically allows judicial override of a jury's sentencing determination, including an override based on judicial findings of fact, so long as the jury has found at least one aggravating circumstance that makes the defendant "death eligible."  This was an unreasonable application of, or contrary to, the Supreme Court's *Apprendi* precedents.  Because the trial judge in Lockhart's case would not have been legally authorized to impose a sentence of death in the absence of the judicial findings of fact that he made at the sentencing phase of Lockhart's proceeding (*i.e.*, his override would have been reversed on appeal as a matter of law in the absence of those judicial findings of fact), the *Apprendi* rule was violated.

-49-

## **PRAYER FOR RELIEF**

111.   For the reasons set forth above, as well as for any reasons set forth in an amended petition, Lockhart prays for the following relief:

a.   an order allowing his ballistics expert Francis "Jay" Jarvis to conduct a forensic examination of the gun, and an order granting Lockhart a federal evidentiary hearing at which he can present the results of Mr. Jarvis's examination, so that Lockhart can prove the prejudice prong of his claim of ineffective assistance of counsel at the guilt phase;

b.   a writ of habeas corpus vacating Lockhart's capital murder conviction;

c.   a writ of habeas corpus vacating Lockhart's death sentence; and

d.   any other relief that the Court deems necessary and appropriate.

Respectfully submitted,

/s/ Tiernan W. Luck
Tiernan W. Luck
Luck Law, LLC
621 South Hull Street
Montgomery, AL 36104
Phone: (334) 262-5455
Fax: (334) 263-1130
twl@lucklaw.net

127403910_1

Aaron M. Katz (*pro hac vice* forthcoming)
Ropes & Gray LLP
800 Boylston Street, Prudential Tower
Boston, MA 02199
Phone: (617) 951-7000
Fax: (617) 951-7050
Aaron.Katz@ropesgray.com

Jolene Wang (*pro hac vice* forthcoming)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Phone: (212) 596-9000
Fax: (212) 596-9090
Jolene.Wang@ropesgray.com

*Attorneys for Courtney Lockhart*

Dated: June 19, 2022

127403910_1

## <u>ATTORNEY VERIFICATION</u>

I, Tiernan W. Luck, am an attorney acting on behalf of Petitioner Courtney Lockhart in this matter.  I hereby verify, and swear and affirm under penalties of perjury, that the foregoing allegations in this petition are true and correct to the best of my knowledge and that the claims set forth in the petition are meritorious.

<u>/s/ Tiernan W. Luck</u>
Tiernan W. Luck
Luck Law, LLC
621 South Hull Street
Montgomery, AL 36104
Phone: (334) 262-5455
Fax: (334) 263-1130
twl@lucklaw.net

Dated: June 19, 2022

127403910_1